UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER GIERER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:17CV2624 HEA |
| | ) | |
| | ) | |
| REHAB MEDICAL, INC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Summary

Judgment, [Doc. No. 10]. Plaintiff opposes the Motion. For the reasons set forth

below, the Motion will be granted.

Plaintiff, a former sales representative for Rehab Medical, filed this action

against her former employer alleging wrongful discharge in violation of public

policy, (Count I), violation of the Missouri Sales Commission Statute, § 407.913,

(Count II) and Unjust Enrichment (Count III).

### Facts and Background

The undisputed material facts are set forth below.

Defendant Rehab Medical is a supplier of various electric-motorized

wheelchairs. Plaintiff alleges she was subject to retaliation after expressing concern

regarding Rehab Medical's alleged falsification of documents to the Medicare federal health insurance program.

Rehab Medical is a provider of medical mobility equipment, including complex wheelchairs. Rehab Medical operates in a number of different states, including Missouri. Equipment sold by Rehab Medical is at times covered by private insurance, but a large part of equipment sold by Rehab Medical is authorized and paid for by Medicare. Rehab Medical's sales representatives obtain customer referrals from area medical professionals, and assist customers through the process of determining the appropriate equipment they need depending upon their level of physical mobility.

Medicare and Medicaid have very specific guidelines that Rehab Medical must follow in order for a customer's wheelchair to be reimbursed such that the customer may receive the wheelchair and Rehab Medical will receive payment. The guidelines require that paperwork is submitted for reimbursement within a specific amount of time, and meets specific requirements as to the type of information that must support the request. During the term of Plaintiff's employment, all final paperwork was to be faxed by the medical office and is not submitted directly by the sales representatives.

A sales representative's coordination of services includes conducting a preliminary customer assessment by interviewing the customer; arranging and

obtaining the required prescriptions for the customer's physical therapy and/or

occupational therapy evaluation; obtaining product recommendation letters;

obtaining a face-to-face appointment with the treating physician; gathering and

submit quotes; coordinating an evaluation with an ATP, if necessary; completing

all internal and external paperwork; and coordinating final approval by obtaining

the physician's signature on the order prescription.

Once all necessary documentation is obtained by the sales representative, the

documentation is sent to Rehab Medical's internal review team, which audits the

documentation to ensure all documentation has been submitted, and the

documentation is not deficient in any manner. If the documentation is not complete

or is otherwise deficient, the file is sent back to the sales representative to cure any

errors or deficiencies by obtaining the necessary information from the medical

personnel involved in the mobility evaluation, all while adhering to accepted

Medicare recordkeeping principles. Plaintiff avers that deficiencies in the

documentation are often corrected by Rehab Medical staff fraudulently changing

dates and altering medical records, without involvement of any medical personnel.

During the relevant time period, upon receipt of a completed file, the file

was reviewed internally to ensure it complied with the applicable guidelines. If so,

the equipment was delivered to the customer and then billed through the applicable

insurance. At times, the internal review team would deny a claim for lack of

information or documentation errors. The file was then sent back to the sales representative to cure any additional deficiencies, if possible, including if there is sufficient time before Medicare, for example, requires that the process is started from the beginning, if applicable.

Typically, a customer's product is delivered to the customer within 120 days from the date of the customer's face to face encounter with the prescribing physician. Rehab Medical is paid by Medicare, via electronic transfer remittance, within approximately 30 to 60 days of authorization.

Rehab Medical's standard equipment is often sold on a rent to own basis such that Rehab Medical receives payment on a month to month basis, for a total of 13 months. As a result, while some mobility devices may be sold and delivered in January of a particular year, Rehab Medical may not receive full payment for the equipment until sometime in the spring of the following calendar year, depending upon whether the customer continues using the equipment and Medicare continues paying for it. Other claims are paid in full shortly after submission and approval by the insurer or public health program.

Sales representatives are paid a base salary, and eligible for commission. Sales representatives are only paid on actual revenue received for a particular sale during their employment. Medicare and private pay insurance companies have set reimbursable amounts for equipment. Accordingly, the list price and quoted price

of an ordered product is immaterial to the commission calculation because the calculation is solely based on actual revenue received. Plaintiff believes the product's price is material to the commission calculation as described by the clear terms of the offer letter.

Rehab Medical hired Plaintiff effective October 13, 2013 in the position of Sales Representative, in St. Louis, Missouri. During her employment Plaintiff only worked with customers in the St. Louis metropolitan area and parts of Southern Illinois. Plaintiff's job duties included assisting customers in finding equipment that best meets their individual needs and acting as a liaison between Rehab Medical, the customer, referral sources, and insurance companies. As part of her job, she also made sales calls, solicited orders and presenting educational materials to referral sources. Plaintiff never performed any duties other than duties of the Sales Representative position for which she was hired.

Plaintiff received training from her direct supervisor Jenna Domeck.

Plaintiff has acknowledged receipt of Rehab Medical's Employee Handbook. Ms. Accardi testified that the Handbook is available online for the employees to review. The Handbook includes a Complaint Procedure addressing "Reporting an Incident of Harassment, Discrimination, or Retaliation." The policy provides that "Rehab Medical strongly urges the reporting of all incidents of discrimination, harassment or retaliation, regardless of the offender's identify or

position. Individuals who believe they have experienced conduct that they believe to be contrary to Rehab Medical's policy or who have concerns about such matters should file their complaints with their immediate supervisor. If the supervisor is unavailable or an individual believes that it would be inappropriate to contact that person, one should immediately contact the Human Resources Department." The policy further provides that "[e]mployees who have experienced conduct they believe is contrary to this policy have an obligation to take advantage of this complaint procedure." The Employee Handbook also includes an Employee Conduct policy which provides a non-exhaustive listing of "examples of infractions of rules of conduct that may result in disciplinary action, up to and including termination of employment." The examples include "unsatisfactory performance or conduct."

The Employee Handbook also includes a section discussing progressive discipline and discipline other than immediate termination. It provides that "Rehab Medical may use progressive discipline at its discretion," which may involve any of "four steps – verbal warning, written warning, final warning (can include suspension without pay), or termination of employment – depending on the severity of the problem and the number of occurrences." The discipline policy is clear that "[t]here may be circumstances when one or more steps are bypassed." The Employee Handbook further provides that "[i]f an employee does not meet

[standards of work performance], Rehab Medical may, under appropriate circumstances, take corrective action, other than immediate dismissal," including by at times utilizing a Performance Improvement Plan.

Rehab Medical and Plaintiff entered into an offer letter agreement ("Agreement") on September 26, 2013. Both Rehab Medical and Plaintiff signed the Agreement. The Agreement provides "[b]y signing this letter, you agree to the offer and terms of employment as stated herein and agree that no other written or oral promises or representations have been made." The document further provides that Plaintiff's annual salary upon hire was $36,000. Plaintiff was also entitled to "8 % [c]ommission on monthly sales receipt during term of employment."

During Plaintiff's employment, commission on revenue received in a particular month, and attributable to the work of a particular sales representative, was paid the following month and included on the regular paycheck issued that following month, which was the 20th calendar day of said month.

Plaintiff further realized during her employment that none of her commissions were paid until Rehab Medical received full satisfaction.

Doug Deck, Rehab Medical Chief Financial Officer, provided Plaintiff with her monthly commission reports. Keith Hawkins provided Plaintiff with monthly sales reports.

During her employment, Plaintiff never disputed or objected to Keith Hawking to the accuracy of any commissions due and paid. During her employment, Plaintiff never disputed or objected to Keith Hawkins to the timing of when commissions were paid.

For the pay period of October 1 through October 14, 2013, Plaintiff earned $240.72, after taxes and other deductions, and received said wages via direct deposit. For the pay period of October 16 through October 31, 2013 Plaintiff received her regular salary of $1,500, which after taxes and other deductions totaled $1,111.09. Plaintiff received her regular salary of $1,500 per pay period from December 1 through June 30, 2016. Plaintiff received all salary she earned in July 2014 prior to her termination on July 7, 2014.

In addition, commissions Plaintiff earned each month were reflected on the second paycheck she received each month during her employment.

In January 2014, Plaintiff was paid $594.04 in commissions. In February 2014, Plaintiff was paid $13.18 in commissions. In March 2014, Plaintiff was paid $288.76 in commissions.  In April 2014, Plaintiff was paid $638.30 in commissions.  In May 2014, Plaintiff was paid $429.79 in commissions. In June 2014, Plaintiff was paid $889.07 in commissions.

Plaintiff was also provided an advance against future commissions earned in February, March, and April 2014. Ex. 10; Ex. 11, Doug Deck Email; Ex.3, pp.

145-146, 165-166, 380-381. Specifically, Plaintiff received an advance each month in an amount that, added to the commissions earned Plaintiff totaled $1,166.67. Following a request by Plaintiff, Mr. Hawkins agreed to provide Plaintiff with the advance in order to assist her financially until her commissions were at a higher level such that Plaintiff would have a better income. The total advance against future commissions that Plaintiff received from February through April 2014 was $2,559.77.

Even though Rehab Medical does not pay out commissions the same month they are earned, when calculating her commission up to the date of her termination, July 7, 2014, Rehab Medical accounted for payments on equipment sold by Plaintiff and received in July 2014,. Plaintiff earned $347.55.

The July commission payment totaling $347.55 was offset against the remaining $2,559.77 advance amount Plaintiff owed to Rehab Medical for the February through April 2014 advance she received.

After applying Plaintiff's last commission amount of $347.55 to her advance payments, Plaintiff still owed Rehab Medical $2,212.22 that remains unpaid to this date.

After the termination of her employment, Plaintiff demanded that Rehab Medical pay her commissions on a list of customers for sales she allegedly completed prior to her departure. Many of the customers identified on Plaintiff's

Customer List never purchased equipment and Rehab Medical never received any revenue. For each customer identified in Plaintiff's Customer list for which a sale was actually made, Rehab Medical received reimbursement (revenue) after Plaintiff's employment was terminated; Plaintiff received commissions on any revenue received while she was still employed in accordance with Rehab Medical's policies.

In accordance with the terms of the Agreement and Rehab Medical's standard practice, Plaintiff was not paid commissions on sales where revenue was received by Rehab Medical after the termination of Plaintiff's employment.

As a condition of her employment, Plaintiff was required to meet a monthly sales quota. Rehab Medical's monthly sales quota consists of a point system where each particular type of medical equipment which is delivered to a customer, that is, approved for reimbursement, counts as a particular percentage towards the monthly goal. Plaintiff, like all other sales representatives, started with a low quota at hire, and the quota gradually increased. The gradual increase is designed to allow sales representatives a period of time to acclimate to the sales process and their new job.

Under the quota system, each piece of equipment has a point value wherein the more expensive and complex products have a higher points value than less expensive products. By way of example, a complex chair has a higher point value than a chair cushion. Each sales representative is provided a numerical monthly

quota. Monthly quota points are earned only after delivery of a product. Defendant contends that points were given when the product could be billed; Plaintiff contends that delivery was the sole criteria for assessing points.

Plaintiff, like other sales representatives, received credit for a particular piece of equipment sold when it actually delivered to the customer, after being approved for reimbursement by Medicare, and thus sale to the customer by Rehab Medical. Plaintiff claims she was never advised that receipt of payment impacted her receipt of quota points.

During Plaintiff's employment, Plaintiff was required, like all other sales people in the company, to provide weekly sales reports.

In November 2013, Plaintiff's first full month of employment, her quota was only one point. Plaintiff earned 2.78 points. Only 0.53 of the points were actually earned by Plaintiff. The remainder was transferred to Plaintiff to finalize work done by a departed employee and Ms. Domeck.

In December 2013, Plaintiff's quota was two points. Plaintiff earned 1.93 points. Plaintiff was ranked 43 of 45 sales representatives employed by Rehab Medical with respect to sales and quota points earned in December 2013.

In January 2014, Plaintiff's quota was four points. According to Defendant, Plaintiff earned 0.5 points; according to Plaintiff, she earned one point. Plaintiff

was ranked 43 of 46 sales representatives employed by Rehab Medical with respect to sales and quota points earned in January 2014.

In February 2014, Plaintiff's quota was six points. According to Defendant, Plaintiff earned 2.4 points; according to Plaintiff, she earned 3.1 points. Plaintiff was ranked 37 of 43 sales representatives employed by Rehab Medical with respect to sales and quota points earned in February 2014.

Plaintiff's quota for March 2014 was increased to the standard rate of eight points. In March, Plaintiff earned 1.25 points. Plaintiff was ranked last 43 of 43 sales representatives employed by Rehab Medical with respect to sales and quota points earned in March 2014.

Plaintiff's quota for April 2014 was eight points. Although still below quota, April of 2014 was Plaintiff best sales performance month during her entire employment wherein she earned 7.6 points. Plaintiff was ranked 20 out of 44 sales representatives employed by Rehab Medical with respect to sales and quota points earned in April 2014.

Plaintiff's quota for May 2014 was eight points. In May, Plaintiff earned 3.1 points. Plaintiff was ranked 45 out of 48 sales representatives employed by Rehab Medical with respect to sales and quota points earned in May, 2014.

During her employment, Plaintiff's direct supervisor was Jenna Domeck, Regional Sales Manager. Jenna Domeck reported to Keith Hawkins, Director of

Sales. During Plaintiff's employment, Keith Hawkins was the individual who had authority to discipline Plaintiff and other sales representatives. Keith Hawkins works out of Rehab Medical's Louisville, Kentucky office.

Jenna Domeck was not responsible for or in charge of formally disciplining employees, nor did she have authority to issue written discipline.

Each month Doug Deck as a standard business practice provided all sales personnel with monthly sales/commission reports that detailed the revenue received on accounts and corresponding commission earned; and a ranking of all sales personnel. Plaintiff avers that she received only monthly Commission Reports from Doug Deck. Plaintiff never disputed or objected to the accuracy of her sales and corresponding earned quota points to Kevin Hawkins.

Plaintiff was instructed that she had to improve her sales including in writing via email. The email was dated April 2, 2014.

As a result of Plaintiff's failure to meet her quota for six out of the seven months she was employed with Rehab Medical, especially considering how far below the quota Plaintiff was most of the months of her employment, Keith Hawkins believed that Plaintiff's performance justified termination of employment. However, Mr. Hawkins decided to give Plaintiff one final chance to improve her performance. Accordingly, in lieu of termination, Plaintiff was placed on a Performance Improvement Plan ("PIP").

On June 5, 2014, Plaintiff was notified and acknowledged receipt and obligation to comply with the PIP. The PIP provided that Plaintiff was required to meet at least 70 percent of her total monthly quota for the months of June, July and August 2014. Pursuant to the PIP, if Plaintiff's total points for the single month of June, July or August were less than 4 points (less than 50 percent of the total 8 points quota), Plaintiff's employment could be terminated.

For the month of June, Plaintiff earned 3 total points. Plaintiff was ranked 40 out of 43 sales representatives employed by Rehab Medical with respect to sales and quota points earned in June 2014.

Plaintiff argues that she was not given credit for all of her sales because the St. Louis location ran out of inventory, a situation outside her control.

Given Plaintiff's well-established history of poor sales performance and her inability to meet a greatly reduced quota number Keith Hawkins made the decision to terminate Plaintiff's employment effective July 7, 2014.

Plaintiff has no personal independent knowledge regarding who made the decision to terminate her employment.

Plaintiff alleges that Ms. Domeck directed her to fill in certain medical codes, ICD-9 codes, on mobility evaluation related forms. A Mobility Evaluation is Rehab Medical's internal form used by a sales representative during the initial screening process of a prospective customer to determine if the customer may be

qualified for a piece of mobility equipment. Plaintiff refused because she believed only medical professionals were allowed to fill in the codes along with the medical information, and did not fill in the codes during her employment. She testified that "nobody said a word" about her not filling in the codes and refusing to fill in the codes. Plaintiff never complained to anyone about being directed to fill out the ICD-9 codes.

Plaintiff's supervisor, Jenna Domeck, testified consistently with Plaintiff insofar she testified that Plaintiff explained to her that she was uncomfortable with ICD-9 codes and was told she no longer had to write them down. Domeck told Plaintiff she did not have to write down ICD-9 codes if she did not want to. Plaintiff also alleges that Ms. Domeck told her to show another sales representative how to write a template letters for doctors to use and directed her to create templates.  Plaintiff alleges she was instructed to coach medical personnel regarding how to fill out mobility evaluations to ensure they would meet Medicare approval standards. Plaintiff did not complain to anyone about any of these instructions.

Plaintiff denies this statement as unsupported by the offered citations. Plaintiff testified that she was instructed to invent and type attestation letters and ask doctors to sign them. Plaintiff testified that Ms. Domeck sent her sample attestation letters but needed to send them to Plaintiff's personal email account.

Ms. Domeck instructed Plaintiff to create a template at a doctor's office that would enable a doctor to simply check boxes rather than go through the analysis that Medicare and Medicaid require. Plaintiff testified that Ms. Domeck instructed Plaintiff to coach nurses to open and change the doctor's chart notes to include language that would permit a sale to go forward. Plaintiff testified that she continually complained to Ms. Domeck, her direct manager, that the described activities were illegal and that Plaintiff refused to participate in such conduct.

Plaintiff testified that on one occasion she asked another employee, Jared Rankin, an employee from another state who was visiting the St. Louis office in approximately February 2014, regarding how certain tasks should be completed because Plaintiff thought she was instructed improperly on those tasks. In addition, she alleges that she informed Jared Rankin of the alleged practice of "up-selling" a complex chair. Plaintiff never spoke with Mr. Rankin again.

Plaintiff testified that Jared Rankin was the ATP Manager, not just an employee. Plaintiff testified that she was being instructed to do things that were against the law, including pushing the sale of a complex chair based on what condition the patient *might be in* over the next five years. Plaintiff also testified that Brian Bennett, an ATP from Kansas City said he would write a template for all of Plaintiff's medical centers and Plaintiff told him that was not permitted; Plaintiff testified she discussed the situation with Jenna Domeck afterward. Plaintiff

testified that Ms. Domeck would create her own ATP report although she was not RESNA certified and was not qualified to do so. Plaintiff testified that Ms. Domeck saw no distinction between a patient who had a disease but could still walk, like Michael J. Fox, and a person who was completely unable to be mobile due to the progression of a disease. Plaintiff testified that she was a party to various email communications between Ms. Domeck and various ATPs wherein Ms. Domeck pushed to upsell complex wheelchairs, even when the patient had Alzheimer's disease and the ATP determined the complex chair would be unsafe for the patient to operate.

Mr. Rankin has no recollection of the alleged conversation. By way of context, Mr. Rankin had very little interaction with Plaintiff. During Plaintiff's entire employment, Mr. Rankin was in the St. Louis office for only a day and a half to interview ATP candidates and to oversee a vendor training program. Mr. Rankin testified that had Plaintiff actually informed him of an illegal practice he would have immediately brought the issue to compliance. Mr. Rankin made no such report to compliance because he was never placed on notice of such a claim.

Rehab Medical requires that records be faxed directly from the doctor's office as that eliminates the chance that any employee may lose or be tempted to tamper with the records to make them comply with Medicare guidelines. Plaintiff alleges that she reported this behavior to Ms. Domeck and Patrick Bland, St. Louis

Office Manager. She also told Mr. Ross, "Hey man, not cool." Mr. Hawkins is not aware of this alleged conduct or any report of this conduct by Plaintiff at any time. Plaintiff did not report this conduct to Mr. Hawkins.

Plaintiff alleges that another employee, Stephanie Adair, directed her in writing to instruct a doctor to lie about the date of a patient visit, again, in order to meet Medicare's reimbursement requirements. Plaintiff did not report Ms. Adair's conduct to anyone. Plaintiff testified that Stephanie Adair, a member of the Medicare Review Team, directed Plaintiff to have the doctor change the date of a face-to-face visit with a patient, after which Plaintiff advised Ms. Adair that doing so would constitute Fraud. Ms. Domeck *was aware* of the illegal directive, as she was copied on Ms. Adair's message to Plaintiff. Plaintiff further states that she was placed on a PIP on the same date and hours *after* she received the written directive from Ms. Adair and advised Ms. Adair that her directive encouraged the commission of fraud.

Plaintiff testified that she did not complain to anyone regarding Ms. Domeck directing her to fill in the ICD-9 codes or directing her to create templates or show another employee how to write a template.

Plaintiff alleges that Ms. Curran told her that her supervisor, Derrick Bass, instructed her to engage in various improper activities in order to ensure that sales

submissions would comply with Medicare guidelines so that the equipment would be approved for sale and reimbursement.

Plaintiff did not notify anyone at Rehab Medical regarding Ms. Curran's allegations that Mr. Bass was instructing her to engage in fraudulent conduct.

Plaintiff did not notify Keith Hawkins of any of the alleged improper or fraudulent behavior. No other employees, including Ms. Domeck or Mr. Rankin reported to Mr. Hawkins that Plaintiff had any concerns regarding Rehab Medical's alleged illegal practices. Mr. Hawkins had no knowledge of Plaintiff raising any concerns pertaining to alleged improper or fraudulent behavior during Plaintiff's term of employment.

## Summary Judgment Standard

The Court may grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex,* 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the mere existence of some alleged factual dispute. *Anderson,* 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. *Anderson,* 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. *Anderson,* 477 U.S. at 255. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Id.* at 249.

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.

In order to survive a motion for summary judgment, "the nonmoving party must substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir.

2011) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733–34 (8th Cir. 2003))

(internal quotation omitted).

**Discussion**

**Wrongful Termination**

Plaintiff's wrongful termination count is based on her claim that her

employment was terminated because she refused to falsify documents, and voiced

her concerns about manipulated and altered documentation. Plaintiff claims that

the termination of her employment was wrongful in violation of the Missouri

Public Policy exception to her "at will" employment.

The public policy exception to the at-will employment rule is very narrowly

drawn, and "[i]t is well-settled that public policy is not found in the varying

personal opinions and whims of judges or courts, charged with the interpretation

and declaration of the established law, as to what they themselves believe to be the

demands or interests of the public." *Margiotta*, 315 S.W.3d at 346 (internal

quotations and citation omitted). Rather, "a wrongful discharge action must be

based on a constitutional provision, a statute, a regulation based on a statute or a

rule promulgated by a governmental body." *Id.* (citation omitted). "Absent such

explicit authority, the wrongful discharge action fails as a matter of law." *Id.*

"Subject to these parameters, Missouri's public-policy exception protects an

employee who reports legal violations or wrongdoing to superiors or third parties

('whistleblowing')", and an employee terminated for this reason has a common-law tort action for wrongful discharge. *Yerra v. Mercy Clinic Springfield Communities*, 536 S.W.3d 348, 351 (Mo. App. 2017) (citations omitted). To establish such a claim, "a whistleblower plaintiff must demonstrate that: (1) she reported serious misconduct that constituted a violation of the law and of well-established and clearly-mandated public policy; (2) her employer discharged her; and (3) her report causally contributed to the discharge." *Id.* (citation omitted). *See also Keveney v. Missouri Military Academy*, 304 S.W.3d 98, 103 (Mo. banc 2010).

Plaintiff's cause of action fails because there is no evidence in the record that her alleged whistleblowing causally contributed to her discharge.

The record is replete with evidence of plaintiff's poor sales performance. From November 2013 through June 2014, she never met her sales quota. Plaintiff was consistently ranked at the bottom of all sales representatives company-wide based on sales performance. For example, in December 2013, she was ranked 43 of 45 sales representatives; in January 2014, she was ranked 43 of 46; in February 2014, she was ranked 37 of 43; in March 2014, she was ranked last, 43 of 43.

In April 2014, plaintiff performed at her best, but still fell short of the 8 quota points, earning 7.6 quota points. Plaintiff was ranked 20 out of 44 sales

representatives for April 2014. In May 2014, she dropped considerably, earning only 3.l of her 8 quota points and ranking 45 out of 48 sales representatives.

On June 5, 2014, Mr. Hawkins put plaintiff on a performance improvement plan. He stated that her performance was below company standards and expectation. The performance improvement plan required her to achieve 70 percent of quota for June, July, and August 2014. It specified that "if in any single month your points are below 4, the company reserves the right to terminate your employment at the conclusion of that month."

For the month of June, plaintiff earned 3 quota points and was ranked 40 out of 43 sales representatives. Mr. Hawkins testified, "Given plaintiff's well-established history of poor sales performance and her inability to meet a greatly reduced quota number I made the decision to terminate plaintiff's employment effective July 7, 2017." Mr. Hawkins further testified by affidavit that he had no knowledge plaintiff had any concerns regarding Rehab Medical's practices, and no knowledge of plaintiff raising any concerns during her employment regarding improper or fraudulent behavior.

Plaintiff blames her failure to meet quota in June 2014 on a lack of inventory, however, she has submitted no evidence that any sales were pending but undelivered because of a lack of inventory in June. Regardless, she had failed to

meet her quota for the six months prior to June 2014, and had already been given a written warning in April 2014.

Rehab Medical has a well-documented history of plaintiff's poor performance. Except for her first month of employment, she never met her sales quota. In April 2014, prior to much of the alleged protected activity, Mr. Hawkins had alerted plaintiff to her unsatisfactory sales performance and her need to increase sales. Viewing all the evidence in the light most favorable to plaintiff, and giving her the benefit of all inferences, including assuming she has met the first two prongs of her wrongful discharge claim, the Court finds plaintiff cannot show that her protected activity causally contributed to her discharge. For this reason, the Court will grant defendant summary judgment on plaintiff's claim for wrongful discharge, (Count I).

**Missouri Statutory Claim for Unpaid Commissions Due**

Count II of Plaintiff's Petition is a claim for commissions allegedly unpaid. Plaintiff argues that she is entitled to commissions on moneys received by Defendant after her employment was terminated, but which were based on sales she made during her employment. Plaintiff relies on the Missouri Commission Sales Act ("MCSA")

The MCSA governs the obligation for and payment of sales commissions in the State of Missouri, "focus[ing] on the timely payment of sales commissions

earned by a sales representative under contract with a principal." *Lapponese v.*

*Carts of Colo., Inc.*, 422 S.W.3d 396, 401 (Mo. Ct. App. 2013).

> Any principal who fails to timely pay the sales representative commissions earned by such sales representative shall be liable to the sales representative in a civil action for the actual damages sustained by the sales representative and an additional amount as if the sales representative were still earning commissions calculated on an annualized pro rata basis from the date of termination to the date of payment.

Mo. Rev. Stat. § 407.913.

The MCSA further details how and when the commissions become due.

1. When a commission becomes due shall be determined in the following manner:

(1) The written terms of the contract between the principal and sales representative shall control;

(2) If there is no written contract, or if the terms of the written contract do not provide when the commission becomes due, or the terms are ambiguous or unclear, the commission shall be paid when the product or service is delivered and accepted by the purchaser or the principal receives satisfaction in full;

(3) If neither subdivision (1) nor (2) of this subsection can be used to clearly ascertain when the commission becomes due, then the commission shall be due on the date the principal accepts the order and receives satisfaction in full, unless the custom and usage prevalent in this state for the parties' particular industry is different, in which event such custom and usage shall prevail.

2. Nothing in sections 407.911 to 407.915 shall be construed to impair a sales representative from collecting commissions on products or services ordered prior to the termination of the contract between the principal and the sales representative but delivered and accepted by the purchaser after such termination.

3. When the contract between a sales representative and a principal is terminated, all commissions then due shall be paid within thirty days of such termination. Any and all commissions which become due after the date of such termination shall be paid within thirty days of becoming due.

Mo. Ann. Stat. § 407.912.

The parties entered into a written agreement which set forth Plaintiff's entitlement to commissions. Plaintiff was to receive "8% commissions on monthly sales receipts during the term of employment." This language is clear and unambiguous.

> "Where there is no ambiguity in the contract, the intent of the parties is to be gathered from it alone and the court will not resort to construction where the intent of the parties is expressed in clear and unambiguous language as there is nothing to construe." *Marshall v. Pyramid Development Corp*., 855 S.W.2d 403, 406 (Mo.App. W.D. 1993). "The words of a contract are to be given their plain, ordinary meaning, and ambiguity arises only where the terms are reasonably open to more than one meaning, or the meaning of the language used is uncertain." *Woods of Somerset, LLC v. Developers Surety and Indem. Co.*, 422 S.W.3d 330, 335 (Mo.App. W.D. 2013). "Ambiguity does not arise merely because the parties disagree over the meaning of a provision, and courts may not create ambiguity by distorting contractual language that may otherwise be reasonably interpreted." *Id.*

*Trustees of Clayton Terrace Subdivision v. 6 Clayton Terrace, LLC,* 2018 WL 3028991, at *6 (Mo. Ct. App. June 19, 2018), *reh'g and/or transfer denied* (July 24, 2018).

Plaintiff is only entitled to commissions on sales receipts received *during her employment*. The Agreement does not include any language regarding sales she "generated during her employment." Plaintiff's attempt to add this language to

the parties' agreement is of no avail.  The Court is required, pursuant to the

MCSA, to apply the agreed upon terms set out by the parties.  Plaintiff received

8% of monthly sales *receipts during her employment.*  There is no dispute that

Plaintiff did indeed receive all commissions on sales Defendant received up to and

including July 7, 2014.  Summary Judgment therefore is appropriate as to Count II.

**Unjust Enrichment**

Plaintiff argues that she should recover commissions on sales receipts

Defendant received after the termination based on a theory of unjust enrichment.

Plaintiff's claim is barred because of the parties' agreement which unambiguously

detailed Plaintiff's entitlement to commissions, *i.e.* Plaintiff was, by the terms of

the agreement, entitled to commissions on the sales for which Defendant received

payment during her employment.

An unjust enrichment claim is "based upon an implied-in-law contract," and

"is not actually a contract [but], instead ... an obligation to do justice where no

promise was ever made or intended." *Johnson v. Estate of McFarlin ex rel.*

*Lindstrom*, 334 S.W.3d 469, 474 (Mo. Ct. App. 2010) (citations and quotations

omitted).  A party asserting an unjust enrichment claim must establish that "(1) he

conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and

(3) the defendant accepted and retained the benefit under inequitable and/or unjust

circumstances." *R&R Land Dev., LLC v. Am. Freightways, Inc.*, 389 S.W.3d 234, 243 (Mo. Ct. App. 2012).

An unjust enrichment claim, however, is barred if the parties entered into an express agreement, and if that agreement contemplates the benefit allegedly conferred by the plaintiff. In particular, "[i]f the plaintiff has entered into an express contract for the very subject matter for which he seeks recovery, unjust enrichment does not apply, for the plaintiff's rights are limited to the express terms of the contract." *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010); *see also Al-Khaldiya Elec. & Elec. Equip. Co. v. Boeing Co.*, 571 F.3d 754, 759 (8th Cir. 2009) (recognizing that "[e]xpress terms of an unambiguous agreement preclude quantum meruit and unjust enrichment claims").

## Conclusion

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion for summary

judgment is **GRANTED.**

A separate Judgment will be entered this same date.

Dated this 30th day of September, 2018.

_____
       HENRY EDWARD AUTREY
       UNITED STATES DISTRICT JUDGE